We'll hear argument this morning in Case 18-1195, Espinoza v. Montana Dept. of Revenue. Mr. Comer? Mr. Chief Justice, and may it please the Court, this case asks whether the federal Constitution allows the wholesale exclusion of religious schools from scholarship programs. It does not. Yet Montana's Blaine Amendment requires that exclusion. As a result, the Blaine Amendment discriminates against religious conduct, beliefs, and status in violation of the Free Exercise Clause under Trinity Lutheran. The Montana Supreme Court disagreed. That Court held that barring religious schools from the program did not violate the federal Constitution. This Court should reverse that judgment. Even respondents now concede that excluding religious schools from the program is unconstitutional. But they argue that the Court avoided this discrimination by invalidating the entire program. This is wrong. The only reason the Court invalidated the program was because it included religious schools. And the Court's remedy did not cure its discriminatory judgment. Nor should the remedy shield the judgment from review. Petitioners brought this lawsuit because they were denied scholarships based on religion. And they are still being denied scholarships based on religion. If the Court had shut down the program because it included Muslim schools or African-American schools, there's no question that would be unconstitutional. We ask you to reverse. Respondents argue, in the alternative, that Locke allows them to exclude the religious schools and that this case falls within the play in the joints. But that would allow the exception to swallow the rule. As Trinity Lutheran made clear, the rule is religious neutrality and Locke only a narrow exception. We argue that Locke is the exception that proves the rule. In Trinity Lutheran — JUSTICE GINSBURG May I ask you some threshold questions about Article III standing? Under the Montana judgment, these parents are treated no differently than parents of children who are going to secular private schools. So where is the harm? When a differential is challenged, the Court inspecting the state law can level up, or it can level down. Here it leveled down. So vis-a-vis parents of children going to secular private schools, how are you harmed? MR. BARROWS Your Honor, the Montana Supreme Court lacked the necessary predicate for leveling up or for leveling down because they got the federal judgment. And therefore, getting that question wrong, we would never have moved on to the issue of remedying that problem, because it isn't a constitutional problem. JUSTICE GINSBURG But there's another serious problem, and that's the — parents are not taxpayers. Taxpayers are the people who contribute to these student scholarship organizations. And this Court has held that there is no standing to challenge somebody else's tax status. It seems to me that the Court's decision in Eastern Kentucky is very close to this one. And the Court said, you say you're injured because these hospitals are not providing services to you, but you are not the taxpayer and you can't complain about the tax treatment of someone else. So how do you distinguish Eastern  MR. BARROWS Well, Your Honor, here what's involved is a scholarship program. And the scholarship program's intended beneficiaries are the parents, like our clients, who are enabled to exercise their constitutional right to choose. JUSTICE GINSBURG But they're challenging the tax status of someone else, not themselves. MR. BARROWS No, Your Honor. It's because the Montana Supreme Court has extended their Blaine Amendment to include scholarships that are generated by the giving of tax credits. JUSTICE SOTOMAYOR I'm sorry. Is there any case we've ever had where we've recognized a party who wasn't either the taxpayer or the direct recipient of the taxes, benefits of the taxes? So here the parents not just aren't the taxpayer. They're not the schools that receive the money. Neither are they guaranteed receipt of the money. We're told that there's less money than applicants. So they're like three levels removed. In what other case can you cite for me, have we permitted such a removed party to have standing? MR. BARROWS Your Honor, I don't think that we've had a state constitutional provision ever be applied in such an extended fashion. JUSTICE SOTOMAYOR It doesn't matter. We've had a case involving schools that discriminate, and we've said that those schools, that taxpayers, not taxpayers, that individuals who feel affected by that discrimination don't have standing because they're not the people, they're not the taxpayer, and they're not the recipient of the discrimination directly. So I'm having a problem understanding how you have standing either for the taxpayer or for the school who receives the money. And why you have a lot of contingencies, other than just that taxpayers won't give the $150 without the tax credit, that the school will actually pick them, and that even if picked in the past, that they'll be picked in the future. Seems a high level of contingencies. So mention one case that comes close to that. MR. BARROWS Any case that involves Article III standing where the intended beneficiaries of the program are the school's intended beneficiary. JUSTICE SOTOMAYOR Respectfully, Your Honor, I disagree. The financial benefit from a scholarship program is to the families. The families receive the benefit of the scholarship. The scholarship is used by the families to buy the education and the financial benefit is to the taxpayer who gets a tax credit. That's the intent. It's an incentive for the taxpayer to give money. But there are many incentives that incentivize people to give money. MR. BARROWS Yes, Your Honor. It does incentivize donations. That's its purpose. And it actually succeeded while the program was going in awarding scholarships to two of our three client families. JUSTICE GINSBURG How do you know that it wouldn't have been in the same situation? After all, this is a small credit. It's $150. And if they don't get the credit, if the donors to the organizations don't get the credit, they still get a tax deduction. And that tax deduction is untapped. So how can we even assume that there's going to be less money in the kitty if the credit is removed but the tax deduction remains untouched? I'm looking at right against Allen in Eastern Kentucky and I just don't understand how this case passes the standing bar when those didn't. MR. BARROWS Well, Your Honor, the simple fact of the matter is that our clients received scholarships under this program, which was a financial benefit to them. The tax deductions are not a financial benefit to the taxpayer because they are out $150, whether they pay their tax to the State or they donate $150 to the scholarship organization. There's no financial benefit to them. It's kind of a psychic benefit. But it creates scholarships. It really created scholarships. MS. GINSBURG Mr. Comer, can I go back to Justice Ginsburg's first question? And I don't know whether to call it standing or mootness or anything else, but I guess I am having trouble seeing where the harm in this case is at this point. It's a strange kind of posture we're in. But if you would describe to me what is the harm that the parents are suffering right now currently? MR. COMER Well, right now, their students, two of the family's students, are on scholarships. And next year, they won't be generated by the program. MS. GINSBURG I'm sorry to interrupt. I guess what I'm saying is that because of the Supreme Court's ruling, whether you go to a religious school or you go to a secular private school, you're in the same boat at this point. So I've always understood in these kinds of cases that the harm is the perceived or alleged or actual, whatever you want to call it, discrimination. But there is no discrimination at this point going on, is there? MR. COMER Yes, there is. Because the discrimination occurred in the judgment of the Montana Supreme Court, which considered a federal question, which led to the invalidation of the program. MS. GINSBURG But it led to the invalidation of the entire program as it related both to private secular schools and private religious schools. So the parents of both are affected in the exact same way. MR. COMER That's because the remedy, you can't let the remedy shield the discriminatory judgment. The discriminatory judgment is in mistakenly believing that this Blaine Amendment and the application of it did not violate the federal Constitution. If they got that question right, we wouldn't be here because the program would still be going on and our parents would be ---- MS. GINSBURG I'm sorry, how could that be? Meaning, are you taking the position that as a matter of constitutional law, the Montana Supreme Court constitutional provision is unconstitutional? That states are forced to give money, tax credits, to religious institutions and secular institutions? Are they required always to give money out of these scholarships? MR. COMER No, Your Honor. MS. GINSBURG All right. So let's start there. Are you saying that the Constitution is unconstitutional? Meaning, that the constitutional, Montana's constitutional provision is unconstitutional? MR. COMER Montana's constitutional provision violates the free exercise clause on its face and as applied to this program. MS. GINSBURG So you are saying that states are forced to give money both to secular and religious schools? MR. COMER Not to the schools. This is a case about giving the money to the families. It's not a case about giving money to the schools. MS. GINSBURG Secular and religious families. MR. COMER Yes, if they give to one, they must give to the other. MS. GINSBURG But can the state choose not to give at all? MR. COMER Yes. MS. GINSBURG All right. So let's, if you start from that proposition, the Montana court said, we don't have a law now. Don't give to any. So let's assume that the Montana court did what you wanted it to do and said, this is unconstitutional under the federal Constitution and it's unconstitutional under the Montana Constitution, which is what I think it did, by the way. It said it's unconstitutional under both. Even if it didn't say it, but let's assume it. Let's assume it says it's unconstitutional under the federal Constitution. You're saying they can't say separately it's unconstitutional under the Montana Constitution. They have to keep the program alive. MR. COMER In the circumstances we're dealing with, Your Honor, they terminated the program. MS. GINSBURG I'm not talking about the circumstances. Let's assume their opinion was written exactly the way you want it to be. And they had said, this violates the federal Constitution. But it also violates the Montana Constitution. So instead of leveling up the way Justice Ginsburg said, we're going to level down. That way it doesn't violate either of them. It, we stopped the federal violation because we're not discriminating against the school, any school. And we've now not violating the Colorado Constitution. Can they do that? MR. COMER Are we talking about the court doing this? MS. GINSBURG Can the court doing this? MR. COMER Can the court do it? No. Because when you have a constitutional conflict between the two Constitutions, the federal Constitution trumps MS. GINSBURG But you just told me the federal Constitution doesn't stop the state from choosing not to give aid. MR. COMER That's right. But here the state chose to give aid. And it has been stopped from giving aid to our clients. MS. GINSBURG Well, it chose to give aid consistent with the constitutional amendment. And, and, and the constitutional amendment sets restrictions on funds. And as a result of the restrictions on funds that the constitutional amendment set, in this case, which I have always understood to be a challenge to the way that the constitutional amendment operated on a particular program, as a result of this challenge, what has happened is that neither the parents who want to send their children to religious schools, nor the parents who want to send their children to secular schools, get what they would like to get. So they're both being treated the  MR. KNEEDLER Only as a result of a mistaken understanding of the free exercise clause. MS. GINSBURG Well, we don't usually, I mean, we don't usually sort of grade every line of an opinion. Usually we look to an opinion, and there's a decision below, and it's had a consequence in the world. And the consequence of this decision is that there is no discrimination, that neither, that neither set of parents is getting what they want. Now, you might say, well, both should get what they want. And maybe that would be a better world. Maybe. But the constitutional harm that it seems that you have to allege here is the discrimination, and there is no discrimination. MR. KNEEDLER Your Honor, there is no discrimination because the Montana constitutional provision requires discrimination on its face and as applied to our clients. And if I can point out, this isn't a decision about harmonizing the two constitutions because the Montana Supreme Court did not recognize there was any conflict between them that had to be harmonized  MR. GARRETT Mr. Solito? MR. SOLITO Yeah, I just wanted to ask this simple question. Under our decision in Village of Arlington Heights, is it constitutional for a unit of state government to do something that it could do, but if it does it for an unconstitutional discriminatory reason, is it then unconstitutional? MR. GARRETT Yes, it is, Your Honor. I see the light is on. MR. KNEEDLER Thank you, counsel. MR. WALL Mr. Chief Justice, and may it please the Court, the Montana Supreme Court held that the Montana Constitution requires religious discrimination that the federal Constitution forbids. Parents may not direct scholarships to schools solely because those schools are religiously affiliated. Now the state doesn't defend that error of federal law, but says it was washed away when the Court invalidated the entire program and left everyone empty handed. The Montana Supreme Court had no power under federal law to invalidate anything. It relied on a state constitutional provision that is inconsistent with and preempted by the Federal Free Exercise Clause, and crucially, petitioners continue to suffer from that Federal Free Exercise violation regardless of whether other parents receive scholarships or also suffer as collateral damage. If the Montana Supreme Court had invalidated this program because it included historically African-American schools or all-girls schools, that would be a straightforward equal protection violation. Nothing about it would be cured by the fact that other parents have been denied funding as well. Counsel, you're, you're, I'm sorry, the injury flows through the schools, right? I mean, the money would go to the schools, not to the parents, and we don't have a school in this case. Well, but I think that's really getting at the standing issue, Mr. Chief Justice, and they're losing their scholarships at the end of the school year, as I understand it. They've had them for years, and under the Court's decision, they lose them at the end of the school year. So even I don't take the State to be challenging their Article III injury. And so then it's just a question of whether they're raising their own rights, and they are, because the reason they're being excluded from the program, everybody would say, the answer to the question, why don't these parents get the scholarships, because they want to direct the scholarships to religious schools. Their free exercise is being penalized. They're not raising a right on behalf of the State. Everybody concedes that if all the parents in this program had wanted to choose secular schools, there'd be no basis for the State's Court's ruling. Scholarship program would still exist. It's only because some parents said, I want to send my kids to schools like Stillwater. And at that point, at page 30 of the petition appendix, the State Supreme Court says, we have a State constitutional guarantee, no State funds to religious schools. That's what it says. And that's a straightforward violation of Federal law. Mr. Wall, are you claiming that, what you're calling blame amendments, but that the Montana provision and all the other States that have one, that as a matter of Federal constitutional law, all of those State constitutional provisions must be struck? Well, not the entire category, because I actually think it's a little more nuanced than that. But I am saying what the Court said in Trinity Lutheran. Seven members of the Court said the free exercise clause there compelled what two members of the Court said in your dissent, Justice Sotomayor, the establishment clause forbade. Yes, we think the same is true here. There are 37 — That's a radical decision. We have, we have a founding father, Madison, lobbying heavily for the free exercise clause and equally to stop States from both establishing religions or using public funds to support them. There's been over, since the founding fathers, a long history of people who, for nondiscriminatory reasons, but for reasons related to their belief in the separation of church and State, that have taken the position that the State should not give money to religious institutions. You are suggesting now that Montana in 1972 went through an empty exercise. They looked at the history of this amendment or one like it, said it was odious, admitted some of its people who voted for this bill in 72 said it was a despicable history. But they then looked at the founding father's writings. They looked at the State of Montana's religious tolerance, which had changed dramatically from the Blame Amendment era, and decided that they were going to side with James Madison, one of the fathers of our Constitution, and continue to say we don't want aid to churches. So now — Perhaps you could comment, counsel. So, Justice Sotomayor, that was one of two points I was hoping to make on the merits before I sat down. Every time that the State points to that in its brief, and I think most notably at pages 30 and 31, and what Madison was talking about in the remonstrance, were compelled support laws, preferential aid to the church. Even the State admits at page 30 of their brief, and these are the State's words, there is zero founding-era evidence that you could have a generally available benefit and deny it to an institution based on its religious character. What about — And D. Justice Thomas, I think, walks through the history of the opposite in his Rosenberger concurrence that at the time of the founding, when they gave out land in the Northwest Territory and other statutes to schools, they included religiously-affiliated schools. I think, actually, the tradition that dates to the founding is sort of the opposite, that you can't disqualify them just based on their religious character, but you can have no compelled support, no preferential aid to the church, and that's very different from what's going on here. What did you think of this? I'm having trouble, and I want you to tell me what you really think about this problem, which has probably an answer that you will have thought about. Okay, say in San Francisco or Boston or take any city or state, and they give many, many, many millions of dollars to the public school system, and a lot of them give a lot of money to charter schools. Now, they don't give money to Catholic schools, all right? Now, if we decide you're right, does that all change? Well, no. In certain respects, it doesn't change, Justice Breyer. If they want to open up the funding, they can put limits, secular limits on the program. We're going to give math scholarships or engineering scholarships. I'm not talking about scholarships. I'm talking about the X billion dollars that the state of New York spends on the public school system, and I don't know how much, but I suspect they might spend money on charter schools. Let's call it another 500 million. They do not, I'm just repeating myself, spend money on the Catholic school system. Now, there's nothing immoral about that. That's just what they do, and that comes from the Constitution. All right, it's the same question. If I decide for you, am I saying that they have to give money to the same amount, proportionate to the parochial schools? If they structure the benefit program the way they did here or the way they did in New York. No, no, I'm saying the way they do do it, not the way if they did it here and so forth. If they are giving out generally available public benefits for people to go to private schools, and they're making... Oh, oh, what's private? Why is it that they have to be equal with private, but they don't have to be equal with public? No, when you said charter schools, I took those to private schools. Forget charter schools. Same question. If a city or state gives out funds for private education, which it's not required to do, it can limit its funding to public schools, but if it gives it out and it gives it out just for scholarship to schools... No, my hypothetical was they give it out in, it's called the public school system of the United States. I'm saying that's what I'm talking about. Now, what's your response? What's the difference between this case? You win, and the same with the public schools. They have to give it to parochial schools, too. What's the difference? Justice Breyer, what I'm saying is that in the last paragraph of Trinity Lutheran, when the Court said you can't deny a generally available public benefit to an entity that's otherwise qualified based solely on its religious character or nature... So, Mr. Wold, don't you... That rule applies equally to schools as to playgrounds. Mr. Wold, I mean, there seems, I was one of the seven in Trinity Lutheran, but there seems to me a real difference in this case. In Trinity Lutheran, the State was using the religious status of various people or entities to limit access to an unrelated public benefit, to a completely secular public benefit. Now here, it seems to me that what the State is doing with respect to these educational programs is to say, we don't want to subsidize religious activity. We don't want to subsidize religious education. And further, because of the way that the Supreme Court issued its decision, that will mean that we don't want to subsidize any private education. So you have both the non-discrimination as to that, but even put that aside, what this is, is essentially a State saying, for many reasons that have been viewed as legitimate, even though not shared by everybody, but have been viewed as legitimate for many years, we don't want to subsidize religious activity, in particular religious education. That's a far cry from Trinity Lutheran. So your question gets at the two things I was hoping to say before I sat down. The first is, all we're asking, the petitioners are asking, is that you do what you normally do when you review a State Supreme Court decision. At page 32 of the PET app, it said no problem with federal law. It got federal law wrong. If it had come out correctly on the federal law question, nothing else in the decision would have flowed. The trial court would have been affirmed and everybody would have gotten the scholarships. The application of the State constitutional provision, which was preempted under Trinity Lutheran, was the only basis to impugn the State law. So you should reverse the federal layer and send it back. On the merits of your question, look, I get that you can say it's a harder case because it's education and it's not a playground, and in that sense, it may be a harder question. But the Montana Supreme Court didn't take it as a case about use, didn't try to say this was covered by Davey or any of the rest. It said religiously affiliated stools. That's a status-based distinction, and I don't think we can distinguish that from Trinity Lutheran. Thank you, counsel. Mr. Unikowski. Mr. Chief Justice, and may it please the Court, the Constitution does not bar the State of Montana from enacting and applying a State constitutional provision that keeps its own State legislature out of the business of funding religious schools. The new aid clause does not prohibit anyone's free exercise of religion. To the contrary, it protects religious freedom by protecting religious schools from government influence and ensuring that government cannot use aid as leverage to influence the content of religious education. Petitioners attempt to analogize this case to Trinity Lutheran, but the analogy is inapt for two reasons. The first reason is that the coercion aspect of Trinity Lutheran, which was crucial to the Court's decision, was absent here. In Trinity Lutheran, the Church was and become a nice secular stone building with a daycare facility, and you're going to get the money, or stick to your religious faith and you won't get the money. And that coercion was the premise of the Court's decision that there was a penalty on free exercise. That's not happening in this case, where the State court held that Montana wasn't even capable of knowing whether a particular parent would use money for a religious and nonreligious school, and it therefore held that regardless of how the money was spent, there wouldn't be a tax credit. The second distinction from Trinity Lutheran is that Trinity Lutheran involved the refusal to give money to a church for a completely nonreligious purpose merely because it was a church. This case is different in that the State is simply declining to fund religious education. The State court did not hold that under the no-aid clause, religious schools would be denied funding for nonreligious purposes. So let me start with the standing point which came up during the first half hour. So we didn't, as the Court knows, it's in an amicus brief, but we didn't make the argument in our brief because we concluded that the arguments really went more to the merits rather than standing. We, I mean, we believe there's an attenuated connection between the State action here and Petitioner's free exercise religion, but Petitioners are alleging in their brief that they personally are the victims of status discrimination because they are Christians. We think that's wrong based on what the State court actually did, but historically the courthouse doors have been open to make that kind of argument. But we think on the merits, there simply isn't a prohibition on the free exercise. I'd like to get back to Justice Breyer's question and get your view on it, which I understand to be that why doesn't, do you think the other side's theory leads to a situation where the funding that goes to public schools, if they prevail, wouldn't have to go to religious schools? Well, I mean, I'm not sure of the exact breadth of their theory. I mean, there's a number of amicus briefs that make the exact point. Well, let's take it to be just that. I mean, this is a case about money and the question of whether or not it must go to religious schools. And I'm wondering if the public – the funding of public schools is the same as the situation involved here in your view. I guess I don't understand Petitioners to be making that argument in this particular case. They're not, but that's what's – but it still can bother me. I'd like to know if, in deciding it for them, if I do, that I have made a major change in the public school system. I understand one's private and the other's public. And what I'm asking for, you or them, why would that matter? Well, that is, why would it make a difference if you have to give – I mean, now, don't jump onto my argument and say, great, it supports you. I'm not making an argument to support you. I'm asking a question to find out the answer. Well, I'm not sure exactly how far Petitioners' argument would lead, but I do think that one important point in this case is that States generally have had power over education and to decide that they're only going to fund the public school system. And that is the ultimate effect of the State court's judgment in this case. But I wonder if there's a difference in the sense that – between general funding of the public schools and the decision to provide aid to private schools, except not religious schools. Well, so I think that, you know, the question in this case ultimately boils down to whether the striking down of the program because of the no-aid clause just in and of itself is a violation of the free exercise right of Petitioners. And, you know, the first half of the argument involved a number of questions about how Petitioners are really harmed if the program as a whole is struck down. And I think I heard two sets of arguments from the other side, from Petitioners, both of which I'd like to address. One argument is the sort of broader argument that just the no-aid clause is just constitutionally defective, like by its very nature, because it is discriminatory, it is not capable of being applied, and therefore the court should just remand and tell the court you just can't apply this illegal rule. And the second argument I heard is this somewhat narrower argument that as applied, the problem here is that the court excluded religious schools from a general program as in Trinity Lutheran. So if I could just address those two theories of the case by Petitioners. So I think the first argument really is tantamount to an argument that the no-aid clause is facially unconstitutional, because, like, every single time you apply the no-aid clause, the rule it recites is that religious schools don't get money  Alitoso, I thought they were quite clear that they were not arguing, they were not making a facial challenge. It was a challenge as applied to the particular situation here. Right. So if that's the case, and I agree that that's the tenor of Petitioners' argument. I think the government was actually making a broader argument, but I think that Petitioners' argument is more limited. So if it is the case that in general, the state court can apply the no-aid clause, in other words, it's not just facially discriminatory to say because something is religious. Well, they're not conceding that. They're just saying you have to consider it as applied here. Look, I like your reaction to this way of looking at the case. Maybe it's right, maybe it's wrong. It is a violation of the Federal Constitution if a State supreme court bases a decision on a ground that discriminates in violation of the Constitution. Do you agree with that? I would agree with that, but obviously the question is whether it discriminates in violation of the Constitution, the last part of that. Look, I'm not, I don't object. All right. So, and then the argument is if they, they don't, they don't have to fund private education at all, but if they choose to provide scholarships that are available to students who attend private schools, they can't discriminate against parents who want to send their children to schools that are affiliated in some way with a church. That's the simple argument. And it's hard to see that that's much different from Trinity Lutheran. No, I think it is completely different from Trinity Lutheran. So look, I'm not going to object to the general premise that Your Honor offered, that if there's like a legal rule that just the very application of the rule is constitutionally defective, then you can reverse the State court decision. I'm not going to fight that proposition as a general matter, but that's not the question here. I think the question here is whether the State may apply a no-aid clause. And I think that the answer is yes, because if you accept the premise that the no-aid counsel wouldn't shoot in terms of what you're agreeing with Justice Alito, I just want to press you a little bit further. And let's say a State court decision could be consistent with the constitution or not consistent with the constitution, right? The outcome may or may not be if, if, if the decision rests on an erroneous interpretation of Federal law and remedying that error could provide relief. We have a case, don't we? I mean, in principle, if we assume there's an error of Federal law. Yes. Assuming there's an error of Federal law and that remedying it here might provide relief to plaintiffs, we have a case. So I think that as a general matter, at a high level of generality, if Petitioners identify an error of Federal law in a lower court decision, I think the court can adjudicate the error of Federal law. Okay. So the question really becomes, do we have an error of Federal law? Right. But the question is what becomes an error of Federal law? Suppose, suppose the State said, we're going to allow the scholarship funds to be used for secular schools or Protestant schools, but not for Jewish schools or Catholic schools, unconstitutional. Yeah. So I think that, yes, yes. Okay. So what's different when you say the scholarship funds can be used for secular schools because of the religious status? So I think the right lens to look at that hypothetical is the Establishment Clause, which prohibits the State, regardless of whether there's an infringement on any individual liberty, I think the Establishment Clause prohibits the State from distinguishing between one religion versus a different religion. And I think that's an example. But a lot of the free exercise equal treatment cases, going back to Everson McDaniel, say you can't exclude religious people, religious institutions, religious speech, because it's religious from a generally applicable program. In fact, it's odious to the constitution to quote the words of Trinity Lutheran. So why isn't this excluding religious people, telling them that they're not entitled to equal treatment under the constitution? Why isn't that a violation, a straight violation of the Trinity Lutheran principle, which goes back to Everson? And why is it different from the other hypothetical? I think the State has a choice, right? It's not allowed to tell people, we are going to penalize you for exercising your religion, because that's a prohibition. I think that the core insight of a case like Trinity Lutheran is that there's no difference between the denial of a benefit and a fine. That's a prohibition because you're actually penalizing the decision to exercise religion. That doesn't mean that the State has to fund religious schools, and it also doesn't mean that the State can't just apply a principled view that it doesn't want to get involved in religious education. If you're running a scholarship fund, and there's a group of people lining up for the scholarships, are you secular? Okay. You can get it. Are you Catholic? No, you're out because you're Catholic. Yeah, that's exactly what the state court is not doing. How is that consistent with the principle set forth in Trinity Lutheran or McDaniel, Justice Brennan's concurrence in McDaniel? I think that's exactly what the state court ensured wouldn't happen. It's not just a matter of like... The predicate was that that kind of discrimination is, oh, it does not violate the federal constitution. I think that the state court can say, look, as a state, we have a no aid clause. We have a principled objection to funding of religious institutions, but we understand that this sort of classification of coercing people into being secular is a penalty on religion. So to balance those two interests, we're going to simply level down. And I just want to be clear, we're not defending religious bigotry here, okay? I think no aid clauses have a principle justification, especially in Montaigne. They're certainly rooted in grotesque religious bigotry against Catholics. Do you agree with that? I mean, I think that in the 1880s, there was undoubtedly grotesque religious bigotry against Catholics. I don't think that's... That was the clear motivation for this. No, that's not true. In 1972 constitution, which is where this provision was enacted, I don't think there's any evidence whatsoever of any anti-religious bigotry. I think that... Yes, Your Honor. I'm sorry. No, I want to see if there's any real difference between this and Trinity Lutheran. So what the, excuse me, what article 10, section six of the Montana constitution says that there can't be any aid indirect or direct to any institution, school or other institution controlled in whole or in part by any church, sect or denomination. So if you have a school that has a board of trustees and one or more of the board, members of the board of trustees, ex officio are members of a religious body that would seem to provide control in part. Would that be sufficient under the Montana constitution without looking at all at the nature of the education provided by the school? No, I don't think so. That's not how the state court has construed the constitution. Where's it said, where has it said that that's not how it's construed? That's control in part. So if you read the lower court opinion, there's all this language about how the real problem here is that the money is going to the school, which is going to spend it on religious education. Well, they're talking about schools in general. How do they know what schools they're talking about? No, they're saying that they're not talking about schools in general. There's all this language saying that money is going to go to a school and therefore the month the school is going to spend that money on explicitly religious education. If I could just step back, look, I'm agreeing. I agree that the lower court opinion is not completely clear on this. I mean, part of the problem is I think that this challenge has really changed in this court. In the lower court, it wasn't the no-aid clause that was really being challenged. It was the rule. And so I don't think, I mean, I think the state courts in general should be entitled to adopt limiting constructions of their own state constitutions. I just don't think the state court had the chance to do that here because the argument wasn't really raised. And I think it would be a little unfair in this court to sort of assume the broadest possible interpretation of the state constitution just for purposes of like invalidating it. And may I ask you a question? Let's go back to the basic. Okay. Let's take the proposition here that the law as written giving aid discriminated. I know you're challenging that. Okay. But that it violates the U S constitution. Yes. Because rule one does, because it permits, um, secular schools, but not religious schools from receiving the scholarship. I know you take as a defense position that they can do that. Putting that aside, you're wrong. Assume that I accept I'm wrong. Yes. All right. Now there was a suggestion in an earlier question that if you were wrong and the Montana Supreme court in turn uses the Montana constitution to level down, that it is unconstitutionally acting, that it is using religion to level down. How do you answer that argument? Because that's exactly what we were told in a question, which is they are basing the leveling down on the basis of discriminating against religion. So I think that the answering of that question requires a kind of focus of analysis of exactly what the constitution allows and doesn't allow. All right. So if you accept the premise that rule one is unconstitutional because it discriminates, it says secular schools in and religious schools out, that doesn't answer the question of whether the mere application of a no aid clause that does not lead to a judgment with that effect is also unconstitutional. So I think the crucial point in this case is to look at what the state court did when it applied the no aid clause. No, isn't the crucial question why the state court did what it did. If it did what it did for an unconstitutionally discriminatory reason, then there's a problem under the village of Arlington Heights. So to give you an example, the state legislature sets up a scholarship fund. And after a while people look at the recipients of the scholarships and some people say, wow, these are mostly going to blacks and we don't like that. And that's contrary to state law. So the state Supreme Court says, okay, that discrimination is, we're going to strike down the whole thing. Is that constitutional? So we don't think the race analogy is that. I don't think that's constitutional. And we just don't think that race and religion are identical for all constitutional reasons. What he's saying is that, look, the court took the case in the Prince Edward County thing or the equivalent and said they couldn't do that. They can't shut down all the schools, even though the constitution they didn't say had a right. So that's the similarity. I'd like you to think about that, but I have a more direct question on the merits. Sorry. Uh, look, uh, the state says Catholic schools get some money. Jewish schools don't all right. No problem. Unconstitutional free exercise. Right. And establishment. Okay. The constant, the, the, the state says we'll give police protection to all schools. Oh, people, but no religious institution that's unconstitutional. That's true. And yeah, correct. Now, why is it different? And I'm not saying it isn't, I want to know your reason. Why is it different? Oh, try it. The opposite extreme. The state says we will pay for the salaries of priests if they're Mohammedan, but not if they're Buddhists unconstitutional, right? Yeah. Okay. So why doesn't it also violate the constitution where the state to say, we won't pay the salaries of any priests, but we will pay the head of every other organization. Well, I think that, I mean, you see where I'm, you see how I'm doing that. You see what the point, let me, let me answer that question and then go back to the race question I would like to address. You don't have to answer. I'll give a, I'll give a brief answer. Yeah. Um, so I think that, um, there's a constitutional difference between distinguishing among religions and saying the court is, uh, the government is just going to stay out of religion. That's correct. There's many establishment clause cases saying that regardless of whether there's a civil liberties violation, it's just contrary to principle to disestablishment principles to say that we're going to treat one religion. Okay. I got that. So what about the other part where we said, look, you can't discriminate against all religions by not giving them playgrounds or you can't discriminate against all religions by refusing to give them police protection or fire protection. What about that part? All right. So there's two differences between that case and this one. One is the striking down of the whole program, which we've talked about throughout the argument today. And then there's a second point, which hasn't really come up, which is sort of the Locke v. Davey distinction between a declination to fund religious education and refusing funding merely because someone happens to be religious for a completely non-religious purpose. And I think that can I take you back Mr. Unikowski to, um, the striking down the whole program, because a number of people have suggested that that must be motivated by animus towards religion. Right. And I can think of, um, many reasons why you would strike down the whole program that have nothing to do with animus toward religion. You might actually think that funding religion, um, uh, imposes costs and burdens on religious, um, institutions themselves. You might think that taxpayers have conscientious objections to funding religion. You might think that funding religion, uh, creates divisiveness and, uh, conflict within a society and that for all those reasons, funding religious activity is not a good idea and that you would rather level down and fund no comparable activity, whether religious or otherwise, then fund both. Now, none of those things have anything to do with animus towards religion. And I, I, I think that's right. And I think that's why we don't think the race analogy is apt. And I think it's useful to talk about why the no aid clause was enacted based on the conventions discussions in 1972 and why it makes sense that those Why does that explain why the race analogy is inept? I mean, the legislature may say they, they built parks and pools and they say we're funding those, but if a higher percentage of African-Americans come and use the pools, then we're going to shut down the whole program. And you wouldn't defend that on saying they could have a judgment that it decreases tensions among the different races to keep them. No, you would just look at the facial discrimination, right? And conclude the fact that they, that wouldn't be good under your view. Would it, of course, because they're shutting down the whole program? No. How is that different than religion, which is also protected under, under the first amendment? Because I don't think that race and religion are identical for all constitutional purposes, right? Like, look, if a state constitution had a provision saying that like historically black colleges aren't entitled to any aid at all, that would obviously be facially unconstitutional. You wouldn't even need to get to these as applied challenges at all. Because I think that equal protection clause embodies a judgment that race is never, ever a permissible criterion in any government decision-making at all, regardless, unless strict scrutiny is satisfied, which is very, very difficult. And I don't think this rule is the same in religion. Look, later this term, this court's about to hear a case involving exemptions of religious schools from anti-discrimination laws that distinguishes between, that creates a sort of religious classification, but that does, that's not intrinsically unconstitutional. Was that, was that your answer to Justice Kagan's question? No. So, well, I'd like to give you the chance to do that. So the answer is, I think that if you accept that no aid clauses are not facially unconstitutional, and I think it's a very hard argument to make for all the historical reasons they've existed for such a long time, then you have to accept that it's at least permissible for a state to say, for principled reasons, deeply rooted in national tradition, dating back to Madison, we have a preference to not fund religious activities, not prohibit it, but not fund it. But there's a difference between saying we're not going to fund religious activities and saying we're going to discriminate based on religion. That's the point. They, the state, nobody's claiming the state has an obligation to make particular grants to religious institutions or to provide any funding for private education at all. The question is, can they, if there is a program that is, that's, is designed to benefit, on the basis of religious affiliation. I think what, so that sounds more like the Trinity Lutheran hypothetical. I think what a state, there's certain things a state can't do and certain things a state can do. What I think a state can do is say, look, we have a no aid clause which has existed for a very long time, and that says on its face that we prefer not to fund religious activities, for good reasons I'd like to explain in just a second, okay? Now, we're constrained by anti-discrimination principles from coercing people into abandoning their religion. So if we have these two principles, these principled, non-bigoted, and historically rooted views that we don't want to fund religious activity on the one hand, and the First Amendment, which clearly guards against coercion and penalizing religious faith on the other, the way we're going to balance it is to do what the State court did. And I just want to say one thing about that. Kagan. To do what the State court did, meaning? Yes, to invalidate the program. And I just, I mean, if you look at the reasons the no aid clause was enacted, which I think are similar to the reasons James Madison gave, it's just hard to say that James Madison disabled future states from enacting no aid clauses based on essentially similar arguments to the ones he made. And in 1972, what the delegates basically said was that they conceived of the no aid clause as a mechanism of protecting religious schools from political influence. So to prevent government from using its leverage to influence the content of religious education. There's like a lot of leaders of religious denominations who came forward and testified in favor of the no aid clause for that exact reason. And I think it's very clear why that justification applies with complete force with respect to this program, right? Because it's not. And basically what you're saying, the difference between this and race is it's permissible to discriminate on the basis of religion. It's not permissible ever to discriminate on the basis of race. That's what you're saying. I mean, look, it seems to me that when you talk about discrimination, we can mean two different things, all right? One way of looking at discrimination is to say that just that you can't have a rule that treats religion differently from other subjects, which is I think the core of the argument. And they say, look at the no aid clause. It says religious schools are ineligible, and it imposes no comparable restriction on anyone else, and therefore that's just discrimination and it should be wiped out of the State constitution. So if you buy that argument, then you're basically saying that like every no aid clause since 1835 is unconstitutional. Even at the founding, look, all the State constitutions said things like a tax won't be levied to build a church. That's a form of discrimination, right? Like you can levy a tax to build a bridge, but not a church. I mean, I don't know about every no aid clause in the country. They'd all have to be examined separately if in fact they're challenged. A lot of them, look, I'm not going to get into an argument with you about what happened in 1972, but do you really want to argue that the reason why a lot of this popped up beginning coincidentally in the 1840s at the time of the Irish potato famine, they had nothing to do with discrimination based on religion? I'm not saying that they, no, I'm not saying that at all. I think that the history in the 19th century is very complex. Like there's a, Professor Green, who's a leading scholar on this, wrote a book that both parties cite, which basically says it's a complex history and there's good reasons and there's bad reasons, and it depends on the State. And look, I don't see how Montana could ever- But aren't you saying that, are you? I mean, I don't know. Can we, can you, or could I say this? Yes, race is different from religion. Why? There is no establishment clause in regard to race. What is the establishment clause? Well, it has something to do with not supporting religion. And there is nothing more religious, except perhaps for the service in the church itself, than religious education. That's how we create a future for our religion. Now, there's some line there, and that line may be, what I've just suggested, impermissible under case law of this court, or it may be permissible, but unwise. You'd like to draw the line. Explain it. Okay. So I think that, you know, we haven't talked about the analogies to Locke at all. I'd just like to say a few words about that, which I think are consistent to your question. So it's true that there are factual distinctions between this case and Locke, right? Locke involved training for the ministry, and this case involves secondary education. So I'm not denying, I'm not saying they're on all fours with each other, but the question is whether that distinction can be located in the free exercise clause. Because really, you know, it's true that Locke involved funding of the ministry, but I think this case does too, right? The ministry of teachers towards their students. And I think petitioners have a somewhat revealing... But this is a, this is a school, and education there satisfies the compulsory education laws of the state, correct? That's true. And so that's different from Locke, as Professor Laycock's amicus brief points out, very narrow decision about training of the clergy. And it seems to me where there are two different things going on here, it seems to me. One is to Justice Breyer's question, just funding religion, funding religious schools, generally, or training of clergy is an establishment clause concern. But this, it's a separate issue when you set up a neutral benefit program, police, fire, or scholarships, and allow people to use those things, allow religious institutions to obtain the benefits of those things on a non-discriminatory basis. And the question in this case, it seems to me, is which side of that line this comes on. Is that the proper way to look at it? And if so, why has it come on the funding side? I guess I'm not really sure that's the right way to look at it. I think that it's important to just look at the interests the no-aid clause protects, understand whether those are just unconstitutional, and whether they apply to this case. So as I said, the no-aid clause was concerned about using government leverage to influence religious education. And it's very easy to see how that can happen in the context of even a neutral program like this one. The state can just have a condition. You think that was the design of the no-aid clause, to help religious institutions? Yeah. If you look at the transcripts in 1972, that is what it is all about. There is numerous religious leaders who came forward and testified that that's the reason they wanted it. On the floor of the convention in 1972, the strongest proponent was Delegate Harper, who was not an anti-religious bigot. He was the pastor of a church in Helena. And he told his colleagues, drawing on his own religious faith, that the no-aid clause was necessary to ensure that religious schools were independent from government. So I just don't, and there's a committee report accompanying it. Well, no one's compelling the religious schools to participate in a program and or accept funds from the program, correct? That is certainly true, but. So a religious school that doesn't want to be part of a neutral program doesn't have to be. Yeah, that's true. But I mean, there's still a concern that ultimately the inevitable effect of these programs is that the government would exercise its leverage over schools. And look, this is what people were saying at the hearing. And I think that it may be a little paternalistic, but I think the state is allowed to have a structural provision being arguably paternalistic in its own state constitution. There's no bigotry whatsoever in evidence from the actual convention at which this is enacted. I just don't understand how Montana could have done any better than it did to wipe out its entire state constitution, start all over again, have committee hearings. The other side's argument is the way you can do better is to say, if we're going to give benefits to private schools, which you don't have to do to Justice Breyer's question, you do not have to give benefits to private schools or funds or tax credits. But if you do, don't tell someone they can't participate because they're Jewish or Protestant or Catholic. I guess the concern of the delegates was that if you have money going to religious schools, that's going to lead to entanglement problems. And the way to solve that problem is to have a structural provision saying we're not going to do it. And that's not prohibiting anyone from exercising their religion. It's simply separating the church from the state without, again, preventing anyone from going to any of these schools if they don't want to. And it's true that there's a constraint in the federal constitution that says that you can't coerce people. You can't tell people we're going to penalize you for being religious. But if a state has two principles it wants to stick to at the same time, then we think that it should be able to balance those principles by invalidating the program. Ms. Ginsburg, we can just go back to the standing question. You are not at liberty to waive Article 3. So why do you think this case doesn't fit under Eastern Kentucky? So I'll just answer briefly, Your Honor. Sure. So Petitioners are claiming they personally are the victims of status discrimination, which is the argument that wasn't made in that case. So we think that they're allowed to make that argument. It's just incorrect on its merits. But of course, this argument is made in amicus brief. And as you say, we're not able to waive it. Thank you, counsel. Mr. Comer, two minutes remaining. Thank you. What we're saying here is that what Trinity Lutheran says, the state can't discriminate on the basis of religion. The decision is crystal clear when you read it that that is what they are doing in this case. They focus on the religious affiliation or religious nature of the schools. They are not talking about what the schools do. They are talking about what the schools are. Second, Zellman has already answered the question about who this program is aiding. It's not aiding the schools. It is aiding the parents. You have a choice to make about the parents here. You can either view them as mere inconsequential conduits through which public funds flow to the religious schools they choose, or you can regard them as you did in Zellman, as free and independent decision makers who are being given the power to choose a religious education or a secular education in private schools. We are not arguing that the state couldn't just fund public schools. We are saying that when the legislature, when the state makes the decision to empower parents to exercise their right to choose and direct their children's education, that the state cannot distinguish between parents who want a religious education for their children and parents who want a secular private education for their parents. We are only in that area because the state legislature has made, like Montana did, the decision to open it up beyond the public schools. We don't question that the public schools must be secular. This court recognized that in Shemp, and as a result, the public schools now must be secular. But at the time these provisions were passed, the public schools were not secular. That is why. It's almost sort of an illusory state, isn't it? The legislatures can choose to give money or not. If they choose, they have to do it this way. But the court system is out of it because it can't force the legislatures to act constitutionally under their own constitution. You may. That's basically what you're saying, isn't it? You may answer briefly. And not fund. The we're saying the legislature ab initio might be able to do more than what the court should have done here. They should have answered the federal question. They should have recognized that Trinity Lutheran is applicable. They should have recognized they were applying Locke exactly the way Missouri tried to. Thank you, counsel. The case is submitted.